# IN THE COURT OF APPEALS OF IOWA

No. 13-1719
Filed November 13, 2014

**IN THE MATTER OF THE ESTATE
OF ELIZABETH GAETA, Deceased.**

**And also Concerning
THE CHARLES GAETA REVOCABLE TRUST
and THE ELIZABETH GAETA REVOCABLE TRUST**

**CHARLES GAETA,**
        Objector-Appellant,
**and**

**PHILIPPA CLESTER and MICHAEL GAETA,**
        Trustees/Executors-Cross-Appellants,
**vs.**

**JOSEPH B. GAETA and ELIZABETH A. HACKETT,**
        Objectors-Appellees.
_____

        Appeal from the Iowa District Court for Muscatine County, Paul L. Macek,

Judge.


        A son appeals and the trustees cross-appeal the district court's ruling on

the final report and denial of the trustees' application for discharge. **REVERSED**

**AND REMANDED ON APPEAL; REVERSED IN PART AND AFFIRMED IN**

**PART ON CROSS-APPEAL.**


        Roger A. Huddle of Weaver & Huddle, Wapello, for appellants.

        Patrick L. Woodward of McDonald, Woodward & Carlson, P.C.,

Davenport, for appellee Joseph B. Gaeta.

Rosalinda A. Eichelberger of Eichelberger Law Office, P.C., Muscatine, for appellee Elizabeth Hackett.

John E. Wunder of Wunder Law Office, Muscatine, and Robert M. Hogg of Elderkin & Pirnie, P.L.C., for trustees/executors-cross-appellants.

Heard by Mullins, P.J., and Bower and McDonald, JJ.

**BOWER, J.**

This appeal arises from the district court's ruling on the final report of trustees Charles Gaeta and Philippa Clester (the trustees) and the court's denial of the trustees' application for discharge. On direct appeal, Charles Gaeta claims the court erred in directing his share of the trust be reduced by the portion of the life insurance proceeds he received. The trustees seek guidance on the treatment of the insurance proceeds. On cross-appeal, the trustees raise three issues. First, the trustees claim the court erred in requiring a more detailed explanation of an arrangement the family created to provide care for their mother. Second, the trustees ask us to reverse the court and award the trustees a fee amounting to two percent of the trust estate. Third, the trustees object to the court's requirement the trust accounting must be presented using generally acceptable accounting principles (GAAP).

We find the language of the trust is ambiguous and extrinsic evidence shows Charles should retain the proceeds from the life insurance policy, minus the life insurance payments made by his parents. We find the record provides a sufficient explanation for the arrangement the family created to provide care for their mother, though the trustees should have placed the arrangement in writing. We find the court's decision awarding the trustees $20,000 in fees was not an abuse of discretion. Finally, we find the issue concerning the accounting method to be moot.

## I.  BACKGROUND FACTS AND PROCEEDINGS

Elizabeth Gaeta (Betty) and her husband Charles Gaeta (Charlie)[1] had eight children and owned multiple assets including farmland and stock in a farm corporation.  The eight children are: Joseph B. Gaeta (Joe), Charles J. Gaeta (Charles), Elizabeth A. Hackett (Elizabeth), Louis C. Gaeta (Louis), Vincent Gaeta (Vincent), Michael Gaeta (Michael), Maria Collins (Maria), and Philippa Clester (Philippa).

Estate planning began in 1992 when Betty and Charlie executed mutual wills.  Codicils in June 2001 and January 2002 modified the wills.  In July 2002, Betty and Charlie hired an attorney to prepare reciprocal revocable trusts for them both.  These trusts were titled: the Revocable Trust Agreement of Charles Gaeta Sr. and the Revocable Trust Agreement of Elizabeth Gaeta.  A month later on August 26, Charlie unexpectedly passed away.  At the time of his death, not all of his assets had been transferred into the trust, and therefore his estate was probated.  Charlie's will named Charles and Philippa as executors and they served in that capacity.  The estate was closed on January 23, 2004.  Due to Betty's health problems from a stroke suffered in 2000 and Charlie's untimely death, Philippa and Michael began acting as trustees for Betty's trust.  Betty was the primary beneficiary of the Charles Gaeta Revocable Trust and the Elizabeth Gaeta Revocable Trust.  Betty passed away on January 4, 2011.

Joe filed an ex parte petition for probate on March 22, 2011, and appointed himself executor of Betty's estate, notwithstanding the fact Betty's trust

---

[1] To avoid confusion, we will refer to Charles Gaeta, the father, by his nickname "Charlie."  We will refer to Charles Gaeta, the son, by his name "Charles."

and will named Michael and Philippa as executors and trustees. On March 28, Joe filed an application for appointment of trustees asking the court to appoint a financial institution as the trustee of both the Charles Gaeta Revocable Trust and the Elizabeth Gaeta Revocable Trust due to what he perceived as mismanagement by his siblings. Michael and Philippa responded by filing a motion to replace Joe as the executors. A hearing was held on May 31, and an order was filed on July 20. The court found no reason to remove Michael and Philippa as trustees. The court also ordered Michael and Philippa to replace Joe as executors. Finally, the court ordered Joe to personally pay $1000 in attorney's fees due to the "baseless allegations" in his complaint.

On November 16, 2012, Michael and Philippa filed a final report and application for discharge of both the Charles Gaeta Revocable Trust and the Elizabeth Gaeta Revocable Trust. They also sought to close Betty's probate estate as she did not have any remaining assets or liabilities. Joe, Elizabeth, and Charles filed separate objections to the final report and accounting.[2]

A hearing on the final report and application for discharge was held on May 8, 2013, and the court entered a ruling on July 15. The court declined to approve the final report due to the report's failure to "include specific and precise valuations." Because of this, the court found the report was only an "interim

---

[2] The objections relevant to this appeal are the following: Joe objected to the gifts made by the trustees to themselves and others, to the accounting provided by the trustees, and to the life insurance policy proceeds received by Charles. Elizabeth objected to the insufficiency of the accounting, to the life insurance policy proceeds received by Charles, and to the requested trustee fees. Charles noted he believed his parents wanted him to retain the life insurance proceeds, but he would follow the methodology of the trustees in the interest of resolving the matter; Charles objected to the estimate of certain fees in the final report and suggested the final report be considered as a proposed distribution.

report" and denied the application for discharge. The court also ruled on the objections of Joe, Elizabeth, and Charles.

On August 7, 2013, Michael and Philippa filed a motion to modify the court's findings and conclusions and enlarge or amend the ruling. The court entered an order on September 24, denying the trustees' request, except the court allowed the trustees to only provide GAAP to the beneficiaries from the date of Betty's death, rather than from the creation of the trusts. From this order, Charles appeals, and the trustees cross-appeal.

## II. STANDARD OF REVIEW

Our review in appeals from rulings by the probate court on the denial of an executor's application to discharge and final report is de novo. *In re Estate of Bruene*, 350 N.W.2d 209, 211 (Iowa Ct. App. 1984). We are not bound by the findings of the trial court, but give them weight, especially when the credibility of a witness is involved. *Id.* We also confine our review to those propositions raised in support of reversal. *In re Estate of Martin*, 155 N.W.2d 401, 403 (Iowa 1968). Probate proceedings concerning costs of estate administration are equitable in nature. *In re Estate of Wulf*, 526 N.W.2d 154, 155–56 (Iowa 1994). We accord the district court considerable discretion in taxing executor and attorney fees to the estate. Iowa Code § 633.3(8) (2013) (defining costs of administration to include both attorney and executor fees); *In re Estate of Petersen*, 570 N.W.2d 463, 465 (Iowa Ct. App. 1997).

III.    ANALYSIS

A.    Life Insurance Proceeds

In 1990 and before the execution of their mutual wills, Charlie and Betty purchased a life insurance policy on Betty's life, which listed Charles as the owner and beneficiary. The couple made payments on the policy through June 2002, at the rate of $6314 per year, for a total of $81,945.65 in payments. In 2004, Charles began making payments on the policy. At the time of Betty's death, his payments totaled $38,967.86, and he received the payout from the insurance policy worth $259,916. Language in Betty's trust, which mirrors the language in Charlie's trust, included a provision regarding the disposition of the life insurance policy on Betty's life:

> Charles J. Gaeta Jr. is the owner of a life insurance policy at Farm Bureau on the life of Elizabeth Gaeta. If he has not switched the policy to name all of my children equally as beneficiaries, then his share of my estate shall be reduced by seven-eighths (7/8) of the value of the paid out policy or, in the alternative, if seven-eighths (7/8) of the paid out value of that policy is in excess of his share of my estate, said amount shall be in lieu of and shall be considered his share.

In their final report, the trustees proposed Charles repay seven-eighths of the premiums paid by Charlie and Betty by withholding $71,233.75 from Charles's share of the proposed distribution of the trust assets.

The court found the language of the trust "unambiguous," and since Charles did not list the other beneficiaries' names on the life insurance policy insuring Betty's life, his share of her estate had to be offset by seven-eighths of the death benefit paid to him. Further, the court disagreed with the trustees and

did not allow an offset of the premiums Charles paid, reasoning the trust did not "provide for any offset or adjustment for insurance premiums" paid by Charles.

On appeal, Charles claims the court erred in directing his share of the trust be reduced by the portion of the life insurance policy proceeds he received. In support of his claim, Charles notes a literal reading of the trust language would require no reduction in his share of the trust estate. He claims the use of the word "estate" refers solely to Betty's probate estate, rather than her trust estate. Betty's probate estate has no significant assets. He asserts the words "Trust Estate," as used elsewhere[3] in the trust document refer to the assets of the trust. If Betty had intended to offset his share of the trust assets, Betty would have used the words "Trust Estate" rather than "estate." As Betty's probate estate contains nothing, Charles's share should not be offset. Additionally, Charles points to the clear intent of Charlie and Betty, which shows they wanted Charles to receive the life insurance proceeds to assist him in purchasing the farm. He claims the testimony from the trial demonstrates his parents' intent. He also notes those statements were corroborated by the insurance agent who sold the policy to Charlie and Betty. Finally, Charles asserts that it would make no sense to deduct his share, given the provisions in the trust regarding his option to the purchase the farm, and the fact he paid almost $39,000 on the insurance policy only to receive a one-eighth share of $32,500.

The trustees make a substantially similar argument, but urge this court to find Charles is entitled to the insurance proceeds, offset by the premiums paid by

---

[3] Charles points to sections 2.01, 2.02, 3.01, 4.02, 4.03, and 6.04, which he claims demonstrate the words "Trust Estate" are only intended to refer to the trust assets.

his parents. The trustees support Charles's conclusion the language of the trust document is ambiguous, due to the "Trust Estate" versus "estate" discrepancy. The ambiguity creates a need to look to other sources to find the intent of the testators. Based on the clear intent of Charlie and Betty, as discerned from the extrinsic evidence admitted at trial, the trustees believe Charlie should receive the full proceeds of the life insurance policy.

Joe and Elizabeth claim the court's ruling on the insurance proceeds should be upheld. They claim the language of the trust is unambiguous and clearly shows the intent of Charlie and Betty. Joe and Elizabeth point to a few factors, supported by "well-settled principles of interpretation," they claim show the trust is unambiguous. First, they note the operative provision, 4.06, is contained in article four, which is titled "Division of Trust Estate." On its face, the provisions of article four deal with trust assets. Second, looking at the trust as a whole, the words "Trust Estate," "trust estate," and "estate" are used to refer to assets in the trust. Third, they claim the first provision of article four, "the Trustees shall divide the balance of the trust estate as provided in this Article," to mean the language in 4.06 can only refer to the trust estate rather than the probate estate. Finally,[4] Joe and Elizabeth note extrinsic evidence should not be considered because the trust is clear on its face. They claim, even if extrinsic

---

[4] Joe and Elizabeth also reference a loan that Charles purportedly took out on the life insurance policy. They claim the only payments Charles made were to pay back the loan, rather than to make payments on the life insurance policy. Joe and Elizabeth cite no evidence to support the fact Charles took out this loan. No evidence submitted at trial or contained in the record supports this assertion.

evidence is used, that evidence does not support allowing Charles to receive the proceeds from the insurance policy.

Our task in this case is to construe the terms of the trust. To aid us in this task we look to the well-settled principles governing trust interpretation. The polestar of our analysis is the rule that the testator's intent must prevail. *Hollenbeck v. Gray*, 185 N.W.2d 767, 769 (Iowa 1971). "[T]his intent, however, must be derived from (a) all of the language contained within the four corners of the [trust], (b) the scheme of distribution, (c) the surrounding circumstances at the time of the [trust]'s execution and (d) the existing facts." *In re Rogers*, 473 N.W.2d 36, 39 (Iowa 1991). Courts should resort to technical rules of construction only if ambiguous language in the trust creates uncertainty about the maker's intent. *Hollenbeck*, 185 N.W.2d at 769. In determining intent, the question is not what the testator meant to say, but rather what is the meaning of what the testator did say. *Rogers*, 473 N.W.2d at 39.

The threshold question is whether the court was correct in determining the plain language of the trust was clear. The interpretations of the language of the trust posed by Charles, and by Joe and Elizabeth demonstrate the trust is susceptible to opposing, yet reasonable interpretations. Therefore, we look to extrinsic evidence to determine Betty's intent. Betty and Charlie expressed their intent to Michael,[5] Philippa,[6] and their insurance agent, Paul Carroll,[7] who

---

[5] Michael testified:

> Okay. We took—we took the trust and we looked through it and were concerned about the issue of the life insurance. We tried to take all of our knowledge, all of our conversations with our parents and the insurance man and put it all together to decipher exactly what our folks wanted.

created the policy. Based on the testimony presented at trial, Charlie and Betty intended the insurance policy to provide enough cash for Charles to purchase the farm, if he so desired. The insurance proceeds were also meant to provide Charles with money so he could afford to retire. Charles worked on the farm his entire life and, therefore, did not have a retirement plan to fall back on should the farm sell after Charlie's and Betty's deaths. While the express terms of the trust could have been written in a clearer fashion, the extrinsic evidence resolves the ambiguity and shows Betty clearly intended Charles to receive the proceeds of the life insurance policy, offset by the amount paid into the policy by Charlie and

And our position is that the life insurance was taken out for Charles and he was to be the owner and the beneficiary. Now, it would make no sense to be an owner and beneficiary and be part of a life insurance policy that when the insured person is deceased you turn around and hand it all back. So there definitely was an agreement that Charles would get the payout. In my conversation with dad, dad told me that Charles was to get the payout, and he was to pay back the premiums.

[6] Philippa testified:

The life insurance policy was to go to Charles so that if he wanted to buy the farm, he could buy the farm. If he wanted to use that for his retirement, because he spent his life on the farm, farming the farm, that's what he could do. The money was to be for Charles. Charles paid the premiums; we did not pay the premiums. If Charles would pay back what dad paid, just like Vince is going to pay back, then we didn't put any of our money in it, it would be Charles' money. . . . My mom wanted everything the way she had it. The life insurance policy was to go to Charles, the assets to be divided among eight of us.

[7] Paul testified:

As a career agent with Farm Bureau Life, we worked with a lot of Farm Bureau member families. Particularly a policy like this was considered by the parents for business transition. The dynamic is you have one or more siblings as part of the family farm operation, one or more siblings off the farm, and what happens is when both parents are gone, the off-farm heirs want their part of the estate that precipitates a farm sale. Oftentimes the on-farm heir is not in a position to make substantial cash payment because this happens when they're in their 50s and 60s. So to provide that person with liquidity and a down payment, we write a life insurance policy on the life of one of the two parents, in this case it was Betty, and that intention was to give Charles enough cash to be in a position to go to the bank and borrow the rest and buy out his siblings if he chose to.

Betty.  We reverse and remand for the entry of an order consistent with this opinion.

### B.    Gifts Received for Betty's Care

After Betty suffered a stroke in 2000, she was unable to care for herself. The children and Charlie held a meeting to decide whether Betty should continue living at the family farm or in a nursing home.  In the short term, they eventually decided to use "hired help" and fill in when the help was unavailable.  Ultimately, upon the advice of their accountant, the entire family agreed upon a system where the members of the family would be compensated at $10 per hour in gift funds when providing care for their mother.  The family determined the arrangement would allow their mother to stay in her home, save money, and allow family members to spend time with her.  Every sibling was aware of the arrangement and seemed to be on board.  Joe declined to assist in the gifts-for-care arrangement because he was already caring for his mother-in-law and had ongoing back problems.

In his objection to the final report, Joe challenged the gifts-for-care arrangement and characterized the gifting as "self-dealing" and a "breach of fiduciary duty" by the trustees.  Joe specifically took issue with the fact the trustees made disbursements in unequal amounts to the beneficiaries, to themselves, and to individuals not named in the trust.  He questioned if the trustees should have filed the proper tax documents to reflect the compensation for services rendered.  After considering Joe's objection, the court determined the trustees had failed to provide enough information about the arrangement and

ordered the trustees to provide information on the payments and an explanation why Joe was not treated equally.

On cross-appeal, the trustees claim the district court erred by finding the gifts given to seven of the eight siblings required additional explanation. They believe the record shows the payments were gifts measured by the amount of time the children cared for their mother. The gifting arrangement allowed the children to spend time with their mother, while saving money on professional home care. Joe failed to participate in the gifts-for-care arrangement and therefore he did not receive any gifts.

Joe claims the court was correct in its ruling. He further claims the gifts-for-care arrangement resembles an employment scenario where the trustees should have filed tax forms for the work performed.

The "gifting arrangement" created to care for Betty is unique in Iowa law. However, this gifting arrangement is not unheard of and is recognized as a way to make it possible for family members to take time off of work to care for their elderly parents, and to avoid the tax consequences of hiring a caregiver. *See* Richard L. Kaplan, *Federal Tax Policy and Family-Provided Care for Older Adults*, 25 Va. Tax Rev. 509, 528 (2005). Reviewing the record, we believe the arrangement was meant to allow the family to conveniently provide care for their mother. Joe conceded he was aware of the gifts-for-care arrangement, did not object, and was given the opportunity to participate. The gifts never exceeded the annual exclusion for tax purposes. We believe it is unnecessary for the trustees to provide further information on the caregiving arrangement. We also

note if the trustees had wished to avoid the confusion created by the gift-for-care arrangement, they should have reduced the arrangement to a writing signed by the participants. Accordingly, we reverse the district court on this cross-appeal claim of the trustees.

### C. Executor Fees

The trustees claim the district court did not rely on substantial evidence and abused its discretion by calculating executor fees at $20 per hour, instead of awarding fees at the statutory maximum of two percent of the entire estate. The trustees claim the court's ruling fails for two reasons. First, since this case involved both the administration of an estate and a trust, the court should have construed Iowa Code section 633.197[8] (Compensation [of executor]) and Iowa Code section 633A.4190[9] (Compensation of trustee) together. Second, the court did not take into account all the hours the trustees spent working on the estate not included in "their three month sampling or representation provided to the court." Conversely, Joe and Elizabeth ask us to uphold the court's ruling due to the fact the trustees spent most of their time dealing with the lower-value trust assets and spent little time on the high-value trust assets.

---

[8] Iowa Code section 633.197 states:
>    1. Personal representatives shall be allowed such reasonable fees as may be determined by the court for services rendered, but not in excess of the following commissions upon the gross assets of the estate listed in the probate inventory, which shall be received as full compensation for all ordinary services:
>    . . . .
>    c. For all sums over five thousand dollars, two percent.

[9] Iowa Code section 633A.4109 states:
>    1. If the terms of the trust do not specify the trustee's compensation, a trustee or cotrustee is entitled to compensation that is reasonable under the circumstances.

Iowa Code section 633A.4109 governs compensation for trustees, although "considerable discretion is left to [the] trial court in the allowance or nonallowance" of such fees. *Bass v. Bass*, 196 N.W.2d 433, 435 (Iowa 1972); *see also In re Woltersdorf*, 124 N.W.2d 510, 511 (Iowa 1963) ("The matter of fees for executors and trustees rests within the sound discretion of the trial court."); Restatement (Third) of Trusts § 38 cmt. c(1), at 150 (2003) (stating trial courts have discretion in determining a trustee's reasonable compensation). Where, as in this case, "the terms of the trust do not specify the trustee's compensation, a trustee or cotrustee is entitled to compensation that is reasonable under the circumstances." Iowa Code § 633A.4109(1); Restatement (Third) of Trusts § 38 cmt. c (1), at 150 (stating factors that may be considered include local custom, trustee's skill and experience, time devoted to trust duties, amount and character of trust property, degree of difficulty, responsibility, and risk assumed in administering the trust, including making discretionary distributions, nature and costs of services rendered by others, and quality of the trustee's performance).

The trustees presented an affidavit in support of their request for trustees' fees, which equaled a total of 992.5 hours. On appeal the trustees request a payment of $63,298.76, or two percent of the entire estate.

While our review of this estate case is de novo, we afford the court "considerable discretion" in the allocation of trustee fees. *Woltersdorf*, 124 N.W.2d at 511; *Petersen*, 570 N.W.2d at 465. The trustees both testified concerning the payment of trustee fees. Michael testified the hours he and

Philippa submitted to the court evidencing the time spent on the trust business were less than the amount they actually worked. He claimed Joe complicated their administration of the trust by filing various lawsuits and generally impeding their ability to deal with issues at Betty's house. Michael further noted he took time off from work to deal with trust business. He approximates his lost wages total $23,000. Michael admitted he had no specialized skills or education that would act to qualify him as a trustee. He also admitted over half of the trust consisted of stock from Louis Gaeta Inc. and required little time to administer.

Philippa also testified about her role as trustee. She claimed she deserved the requested fees due to the amount of time she had spent in court and the hassle she had been put through in the administration of the trust. She noted a bank would have charged more than the fees she requested and her parents did not desire to have their affairs managed by a bank.

The district court properly calculated the trustee fees at twenty dollars per hour, which we believe is a fair and reasonable amount based on the circumstances. The most persuasive factors weighing against upsetting the court's ruling include: The trustees relative lack of skill and expertise, the time devoted to potentially insignificant trust matters, the nature and cost of the services rendered by the trustees' attorney, and the quality of the trustees performance. We wonder if considerable cost and time (and litigation) could have been saved if a bank trustee had been used, rather than family members. Accordingly, we affirm the district court on this cross-appeal claim of the trustees.

### D.    GAAP Accounting

The court ordered "[t]he trustees to provide the beneficiaries with annual accountings according to generally accepted accounting principles for each year subsequent to each settlors' death."  On January 3, 2014, the trustees filed a notice with the Muscatine County Court stating they had provided the heirs and attorneys of record with GAAP accountings for the Elizabeth Gaeta Revocable Trust and the Charles Gaeta Revocable Trust.  In his brief, Joe concedes the accountings were sufficient and no longer objects to the trustees' accounting.

"One familiar principle of judicial restraint is that courts do not decide cases when the underlying controversy is moot."  *Rhiner v. State*, 703 N.W.2d 174, 176 (Iowa 2005); *see also, e.g., Lalla v. Gilroy*, 369 N.W.2d 431, 434 (Iowa 1985) ("A live dispute must ordinarily exist before a court will engage in an interpretation of the law.").  "[O]ur test of mootness is whether an opinion would be of force or effect in the underlying controversy."  *Wengert v. Branstad*, 474 N.W.2d 576, 578 (Iowa 1991).  Here, the trustees have provided an accounting meeting the requirements set by the court, and the objector has rescinded his objection.  A ruling on this issue would only result in an academic exercise and is therefore moot.

## IV.    CONCLUSION

Upon our de novo review, we reverse the district court and find the language of the trust is ambiguous and extrinsic evidence shows Charles should retain the proceeds from the life insurance policy, minus the life insurance premiums paid by Betty and Charlie.  We also reverse the court and find the

record provides a sufficient explanation for the arrangement the family created to provide care for their mother, though the trustees should have placed the arrangement in writing.  We affirm the court on its decision to award the trustees $20,000 in trustee fees.  Finally, we find the issue concerning the GAAP accounting method to be moot.

**REVERSED AND REMANDED ON APPEAL; REVERSED IN PART AND AFFIRMED IN PART ON CROSS-APPEAL.**